JS 44   (Rev. 3/99)

# CIVIL COVER SHEET

RECEIVED

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

MAR 18 2004

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## I. (a) PLAINTIFFS

3 04 CV - 577 - N

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff  Dallas
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Collin
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Brett Barnes
18352 Dallas Parkway, Su. 136
Dallas, TX 75287

Attorneys (If Known)

JCP Legal Department
6501 Legacy Dr.
Plano, TX 75024

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☑ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☑ 4  Diversity
       (Indicate Citizenship of Parties
       in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☑ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☑ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☑ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☑ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Determination Under Equal |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc | | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☑ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       another district
       (specify)

☐ 6  Multidistrict
       Litigation

☐ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

RICO, theft of trade secrets, Breach of contract, etc.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
  UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☑ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY   (See instructions):

JUDGE

DOCKET NUMBER

DATE   3/18/04

SIGNATURE OF ATTORNEY OF RECORD   Brett Barnes

FOR OFFICE USE ONLY

RECEIPT #   _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

**IN THE UNITED STATES DISTRICT COURT FOR
FOR THE NORTHERN DISTRICT OF TEXAS**

**FILED**

**MAR 1 8 2004**

CLERK, U.S. DISTRICT CO T

By _____
    Deputy

Brett Barnes,
Plaintiff

v.

J.C. Penney Company, Inc., J.C. Penney Corporation, Inc.,
Allen Questrom (*CEO*), Vanessa Castagna (*Executive
Vice-President*), Ken Hicks, Nicholas Bomersbach, Jeanine
Connolly(*for dissemination of false information to the news media
and press*), Eli Akresh(*Shareholder Relations*), John Irvin, Lisa
Walton, Dave Owen, Wayne Ruskin, Burl Osborne, Robert
Cavanaugh, John Moser, Joan McComb, Susan Moore, Jonathan
Burnett, Roger Riffel, Andy Kennemer, Dan Eudaly, Diane
Friedman, Stephanie Brown, Tricia Judd, Ryan Souders;
JCP Internet Commerce Solutions, Inc., George Stasick, Richard
Last, Ron Hanners, Lucy Berroteran, Donna Hezeau, Kevin
Strawbridge, David Abbott, Glenda Murrell, Joe Parr, Henry
McKenzie, Veronica Karkuschke, Jason Clark;
JCPenney Legal Department(*for conspiracy to conceal Corporate
Accounting Fraud and violations of the Sarbanes-Oxley Act*), Alan
Langer, Celeste Flippen, Jerome Lipsich, Charles Lotter;
JCP Procurement, Cynthia Hoggatt, Angela Jehu,
Alexis Boudreaux-Ivey, Kristie Crowder;
**Defendants.**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

**3 0 4 C V 0 5 7 - N**

COMPLAINT
(Fraud, RICO, Breach of Contract,
Theft of Trade Secrets, Conversion,
Interference with commerce by threats
or violence, Breach of Fiduciary Duty,
Interference with existing contracts,
Conspiracy to interfere with
civil rights, Defamation, Negligence,
Business Disparagement, Retaliating
against a Federal witness, victim, or an
informant, Injunctive Relief,)

## PLAINTIFF'S ORIGINAL COMPLAINT

### A. Parties

1. Plaintiff, Brett Barnes, is an individual who is a citizen of the State of Texas, and a
   shareholder of the Wall Street publicly listed company on the New York Stock Exchange as
   "JCP" (JCPenney).

2. Defendant, J. C. PENNEY CORPORATION INC., is a corporation that is incorporated
   under the laws of the State of Delaware. Defendant has its principal place of business in the
   State of Texas at 6501 Legacy Drive., Plano, TX. 75024.

   Defendants may be served with process by serving its registered agent for service of process;
   CT CORP SYSTEM at 350 N. ST. PAUL STREET, DALLAS, TX 75201.

3. Defendants, J. C. PENNEY CORPORATION INC., et al. are referred to hereafter
   collectively as "JCPenney".

4. Plaintiff reasonably and justly sues the defendants for the amount of at least $2,000,000,000
   (TWO BILLION DOLLARS) in actual, exemplary, punitive and future damages.

5. The plaintiff has standing, whereby as an employee and/or consultant for JCPenney he discovered a trail of Corporate Fraud, Financial Misreporting, corruption and criminal acts by defendant JCPenney, for which the defendants retaliated to prevent the plaintiff's witness testimony on behalf of investors, stock brokers, the public and governmental agencies.

6. An illegal Cover Up Conspiracy by JCPenney perpetrated bribery/extortion offers solicited by JCPenney demanding that the plaintiff retract letters to the Securities and Exchange Commission (SEC), EEOC and OSHA in violation of the Sarbanes-Oxley Act.

## B. Jurisdiction and Venue

7. The court has jurisdiction over the lawsuit because the action arises under at least the following:

8. This lawsuit is brought against defendant J.C.Penney Company, Inc. in Federal Court relating to <u>Federal Questions, Civil Rights Violations, Interstate Commerce</u>, etc.

9. This case arises under the Constitution and laws of the United States and presents federal questions within this Court's jurisdiction under at least Article III of the Constitution, 28 U.S.C. § 1331 and <u>The United States Constitution</u> with regards to the Bill of Rights under at least the 1st and 14th amendments.

10. The district courts shall have <u>original jurisdiction</u> of all civil actions arising under the <u>Constitution</u>, laws, or treaties of the United States.

11. The court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because the plaintiffs and the defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

12. Federal Jurisdiction and Venue is proper in this court whereby J.C.Penney Company, Inc. is an interstate commerce company incorporated in Delaware with its Corporate Headquarters in Texas.

13. Federal Jurisdiction is proper in this case whereby certain defendants are in different states. The Individually named defendants are liable as Executives, Officers, Subsidiaries and Directors who have Pierced the Corporate Veil through civil and criminal acts, including fraud, conversion, breach of fiduciary duty and breach of trust against the plaintiff.

14. This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

15. Federal jurisdiction is proper whereby Defendant Celeste Flippen threatened, intimidated and solicited bribery and/or extortion of a Federal witness in order for her to knowingly obstruct justice and perpetrate fraud.
    <u>An illegal "offer" from defendant Celeste Flippen</u> demanded that the plaintiff, "*Brett Barnes will retract the letter sent to OSHA, EEOC and the SEC*".
    <u>Celeste Flippen, by tampering with a Federal witness to conceal criminal Corporate Fraud by JCPenney</u>, violated civil and criminal Federal laws whereby she may be punished through monetary liability and/or imprisonment by this court.

<u>C. Facts</u>

<u>JCPenney's Corporate Fraudulent Schemes and Civil Conspiracy</u>

16. The defendants unlawful and illegal <u>Enron-type scandalous activities</u> and conspiracy to injure and harm the plaintiff left no options but <u>to seek Justice in this United States Court</u>.

17. <u>In the aftermath of Enron</u>, WorldCom, Tyco and others, JCPenney Corporation will undoubtedly use standard legal defense ploys to evade and falsely blame others for its own civil causes of action and crimes. JCPenney implements deception schemes in many lawsuits.
    The claim by the plaintiff resulted from the defendants failure to cease and desist illegal and unlawful conspiracy with malice towards the plaintiff to disparage, harass, defame, harm and injure after the plaintiff notified JCPenney Executives of CEO Allen Questrom's Financial Misstatements and Corporate Fraud by others at JCPenneys.

18. The defendants conspired to fabricate, alter, falsify and commit aggravated perjury with knowingly false material sworn statements.
    <u>The defendants that perpetrated crimes of aggravated perjury, subornation of perjury, and fraud in a conspiracy include:</u>
    CEO Allen Questrom, Director Nicholas Bomersbach, attorneys Alan Langer, Celeste Flippen and Jerome Lipsich.

19. <u>JCPenney is a major retailer where CEO Allen Questrom was given a five year turnaround mandate as a result of its financial crisis and poor credit.</u> JCPenney Department Stores consist of approximately 1,075 JCPenney Department stores in all 50 U.S. states, Puerto Rico, and Mexico, and a Ecommerce property. JCPenney became an important player in the retail industry in the 1900s. However, as the economy cooled in recent years, JCPenney's earnings and profits similarly declined, making it difficult to keep JCPenney's earnings in line with expectations by industry analysts.

20. Starting at least in 2002, <u>JCPenney engaged in an improper accounting scheme intended to manipulate its earnings to keep them in line with Wall Street's expectations</u>, and to support JCPenney's stock price. One of JCPenney's major operating expenses was its vendor contracts. In 2002/2003 Allen Questrom ordered his subordinates to cancel contracts prematurely, refuse to pay suppliers and vendors, commit theft of trade secrets, and bring everything possible "in-house". This resulted in bonuses, benefits and <u>unconscionable profits for those Executives who unscrupulously breached contracts</u> and injured the plaintiff and others in the midst of its schemes to evade payment for services rendered.

21. JCPenney's senior management directed and approved its legal department to improperly breach and cancel contracts in amounts sufficient to appear that JCPenney's earnings were in line with the analysts' consensus on JCPenney's earnings.
    <u>JCPenney's senior management withheld from investors that JCPenney was sued by numerous suppliers for breach of contract, fraud and other causes of action</u>. Thereby, costing JCPenney shareholders unnecessary litigation costs resulting from its misconduct and wrongful acts to defraud and deny payment for services rendered by its suppliers.
    Thus, in this manner, JCPenney materially understated its expenses, and materially overstated its earnings, thereby defrauding the plaintiff and other investors.

22. As a result of this improper accounting scheme, <u>JCPenney materially underreported its expenses and materially overstated its earnings</u> in its filings with the Securities and Exchange Commission at least during certain periods in 2002 and 2003.

23. The plaintiff became aware of the JCPenney's criminal and civil acts when the defendants generated fabricated and knowingly conflicting sales figures to materially falsify and misreport revenues to the plaintiff and JCPenney investors.

   After the plaintiff notified Executives at JCPenney by formal letters, including CEO Allen Questrom, of its misstatement of revenues, the defendants conspired to retaliate, harm, injure and defame the plaintiff.

   The devious scheme of the defendants was to intimidate, harass, frighten, victimize, subvert the legal system, suppress the plaintiff's and other witnesses knowledge of JCPenney's crimes. This is a fear tactic known throughout JCPenney's Corporate Headquarters that the defendant perpetrates to prevent witnesses from testifying for the government and the SEC. By interfering with an SEC investigation of JCPenney, the defendants engaged in illegal organized crime of tampering with Federal witnesses.

24. In particular, JCPenney knowingly reported one set of <u>false sales figures to its suppliers and affiliates</u>, while maintaining a separate set of accounting records internally to avoid paying commissions on sales generated by its suppliers, affiliates and vendors.

   Thereupon, <u>JCPenney's senior management fabricated conflicting sales reports</u> as evidenced in part during a separate and distinct lawsuit wherein defendant Nicholas Bomersbach introduced into evidence a fraudulent and materially false JCPenney sales report from July, 2003 that was substantially altered from the original report provided by the record custodian, Donna Hezeau.

25. Combined with the criminal <u>aggravated perjury of Nicholas Bomersbach</u> in 2003 and 2004 JCPenney's defendants, attorneys Celeste Flippen and Jerome Lipsich concealed, by contempt of court, witness Donna Hezeau although she was legally subpoenaed in two separate lawsuits.

   Jerome Lipsich was insane during one court proceeding when he moved to assault an attorney named Lin McCraw, son of Judge John McCraw. Jerry Lipsich was afraid that his illegal cover up would be exposed when Lin McCraw asked the court to produce witness Donna Hezeau for a show cause hearing on her contempt of court charges.

   While JCPenney concealed a key witness, Judge Chris Oldner harshly rebuked Jerome Lipsich for his violent outburst and attacks towards Lin McCraw and moved to restrain Lipsich, while criticizing him for violating the Lawyer's Creed.

   JCPenney's attorneys work in collusion to cover up their clients crimes, while plotting personal attacks against the plaintiff to stop his Federal testimony which would expose JCPenney's scandalous crimes.

26. JCPenney's disclosures in its 2002 and 2003 Form 10-K and in its Form 10-Q for at least the second quarter of 2002 through the 2nd quarter of 2003, failed to include material facts necessary to make the statements made in light of the circumstances in which they were made not misleading. In particular, these filings failed to disclose the company's true and accurate accounting treatment, that such treatment had false financial information, and that the company's revenue reports were fraudulent.

JCPenney Praised the Marketing and Technical Expertise of Plaintiff Brett Barnes

27. Brett Barnes, the plaintiff, was single-handedly the most influential architect of the JCPenney.com website marketing strategies since its creation. He was praised, valued and relied upon repeatedly for several years by JCPenney's technical and marketing staff.

28. According to JCPenney, the expertise of Brett Barnes developed a vast amount of the Online Advertising since the beginning of JCPenney.com around 1998. The defendant admitted in writing that the expertise and trade secrets of Brett Barnes:
"*has brought JCPenney.com and our Media properties from virtually no presence on the major search engines to currently having thousands of targeted keyword listings, many consistently in the top 30 results*".

29. The Plaintiff, Brett Barnes is the marketing genius who developed virtually all the search engine marketing strategies and processes currently in use by JCPenney's website known as JCPenney.com. Additionally, the plaintiff designed, built and programmed a substantial portion of Intranet (internal Corporate) systems for J.C.Penney Company subsidiaries.

30. Other than knowledge captured from the plaintiff, JCPenney's staff were otherwise mostly inexperienced, inept and uneducated in Ecommerce marketing, until the defendants conspired to perpetrate Theft of Trade Secrets from the plaintiff.
    The incompetence of JCPenney's staff was evidenced by its massive turnover rate and firings, while JCPenney obviously viewed the plaintiff as an invaluable asset to its company and retained his expertise for years, until its theft of his secret processes.

Insider Trading at JCPenney

31. Executives George Stasick, Richard Last, Ron Hanners and others at JCPenney.com (under the alter ego disguise of JCP Internet Commerce Solutions, Inc.) have Insider Trading information passed to Allen Questrom, Vanessa Castagna and others, that JCPenney.com plans to become a spin-off publicly traded company when it reaches $1 billion dollars in sales. Vanessa Castagna has recently enacted an unusual amount of buy/sell for JCPenney stock possibly as a possible result of Insider Trading.
    In the alternative, according to a JCPenney human resource manager, Vanessa Castagna knows her days are numbered and prepares to leave JCPenney as Executives "groom" Ken Hicks as her replacement. The plaintiff's knowledge and reporting of possible Insider Trading to the SEC for its investigation was another motive for JCPenney's criminal retaliations against the plaintiff.

32. By engaging in this conduct, JCPenney violated the anti-fraud and reporting provisions of the federal securities laws, the Sarbanes-Oxley Act, various laws protecting Federal witnesses and informants and, unless restrained and enjoined by this Court, will continue to do so.

33. The plaintiff requests, among other things, that JCPenney be enjoined from further violations of federal securities laws as alleged herein, the plaintiff's protection from further assaults of retaliation by the defendants, and that JCPenney will pay a monetary penalty.

34. JCPenney has attempted to destroy the plaintiff's career, business, livelihood and intellectual property. There have been no limitations to the extent of harassment, lies, fraud and deception which the defendant has used to harm, injure and damage the plaintiff.

35. A portion of the defendant's intent to harm the plaintiff has been in retaliation to prevent the plaintiff's evidence and testimony to the SEC of JCPenney's shareholder fraud and other illegal activities. During investigation of this company in preparation for this lawsuit, a large scale cover-up and conspiracy was discovered within the corporate headquarters.

36. The plaintiff has been repeatedly attacked and irreparably harmed with some actions by the defendant. Plaintiff was force to prosecute this claim to prevent total destruction of his livelihood and profession by JCPenney's intentional malicious causes of action.

37. Defendant "JCPenney", Et Al. engaged in scandalous activities similar to Enron, Arthur Andersen, WorldCom, etc.. In fact, defendant Nicholas Bomersbach, a key player in JCPenney's Corporate Fraud, was involved in the Arthur Anderson scandal whereby Enron and other company's documents were shredded prior to the Government investigations. Upon information and belief, JCPenney is guilty of destroying or concealing incriminating documents which will expose the criminal acts of its officers. Employees at JCPenney with knowledge to expose JCPenney's Corporate Fraud are intimidated, threatened, fired, frivolously sued, endure sexual harassment, or are forced to observe victims of JCPenney's retaliation against anyone who dares to oppose its criminal acts.

38. Senior Officers at JCPenney's auditing, investor and accounting companies of PRG Schultz, KPMG, Price-Waterhouse and Mellon Investors were notified by the plaintiff or other witnesses of JCPenney's misreporting of finances. The deliberate indifference, negligence or reckless failure and refusal by the auditors to investigate the financial misrepresentations raises questions about the truthfulness of the alleged "independent" audits of JCPenney.

When PRG Schultz was contacted regarding financial information of JCPenney, Senior Management falsely stated that they were "employees" of JCPenney. This evidenced collusion between JCPenney and the disguised "independent auditors". In the alternative, there are clearly improprieties with alleged independent auditors falsely stating that they are employees of JCPenney in order to filter and possibly alter financial information.

39. This lawsuit is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The claims and other legal contentions herein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

D. Plaintiff's Causes of Action
Against JCPenney and the Conspirator Defendants

40. Plaintiff seeks award of damages from defendant JCPenney for $2 Billion.

41. Plaintiff Action Seeks Injunction, Money Penalties, Prohibitions on Destroying Documents and Making Extraordinary Payments to JCPenney Executives, Officers or Affiliates, and the Appointment of a Corporate Monitor.

42. JCPenney's henchmen and defendants, under the direction of its Executives and Officers, have necessitated the filing of a lawsuit against JCPenney for civil causes of action, and the defendants have perpetrated crimes in violation of <u>FEDERAL LAWS,</u> for which the plaintiff seeks injunctive relief and victim protection:

43. <u>Count 1 – Theft of Trade Secrets</u>

Conversion of Trade Secrets

44. JCPenney has a long history of stealing trade secrets and software from numerous companies. When JCPenney Senior Executives were confronted by the plaintiff with the concerns, a cover up by JCPenney ensued.

45. As with many of its vendors and suppliers, JCPenney commits theft of trade secrets, then disperses them recklessly across industries to induce favors and unfair competition  pricing from competitors.
    While disseminating these pricing structures, processes and confidential information marked as such, JCPenney knowingly captures the best trade secrets to steal for in-house usage, while passing out the less valuable tricks of the trade as bargaining tools to obtain unfair vendor pricing, and thereby profiting by Unjust Enrichment.

46. JCPenney Company authored a recommendation letter about the plaintiff Brett Barnes which stated that he, "<u>brought JCPenney.com and our media properties from virtually no presence</u> on the major Search Engines to currently having thousands of targeted keywords, many consistently in the top 30 results".
    As a direct result of the plaintiff's proprietary techniques, JCPenney.com sales skyrocketed from almost non-existent to about $600 million dollars in 2003.
    JCPenney management estimated 50% or more of JCPenney's Ecommerce sales were directly attributed to the plaintiff's secret formulas, techniques and processes.
    The plaintiff sues JCPenney for $2,000,000,000 (Two Billion Dollars) based on past and future unjustly enriched revenues whereby JCPenney continues through this day to profit as a result of its theft and conversion from the plaintiff. The defendants knowingly refused to pay commissions for services rendered by concealing and fabricating sales reports to the plaintiff, investors and the SEC.

47. JCPenney, with blatant negligence, carelessly and maliciously disperses documents marked as "confidential" to competing suppliers in violation of contract terms. These documents are passed to other companies for Jcpenney to benefit from the trade secrets and business models of vendors through unfair competition schemes.

48. After stealing trade secrets from suppliers, vendors and affiliates, the defendants have a history of using combinations of threats, slander, libel, defamation, malice and any virtually any illegal, unlawful or corrupt scheme they can perpetrate to destroy and disparage businesses and  reputations of JCPenney's victims.

49. Specifically, JCPenney.com had about 6,000 affiliate program vendors in the year 2000. Paul Swenson, Jason Jacobi, Melanie Angermann, Nicholas Bomersbach, Dave Owen and other Jcpenney employees siphoned trade secrets, techniques, processes, and creative from the affiliates. After capturing the non-public information from these affiliates through "in-house" tracking technology, Jcpenney.com then terminated about 3,000 affiliates in 2002, and virtually all the other affiliates in 2003. Jcpenney could not have obtained a significant portion of its trade secrets captured from the affiliates for in-house use through publicly available sources. Media tags were applied to deceive the vendors that the purpose was to track sales and pay commissions, when in fact, the media tags were used by <u>JCPENNEY TO REVERSE ENGINEER TRADE SECRETS OF AFFILIATES, VENDORS AND SUPPLIERS</u>.

50. Media tag tracking was applied to steal the most effective techniques from its suppliers and cancel the affiliate contracts without paying current or future commissions to the vendors. When JCPenney's former senior statistics developer, Andy Kennemer, reported the sales tracking errors to Senior Officers, accounting manager Nicholas Bomersbach terminated Andy to cover up the fraud and known financial misstatements.

51. JCPenney manager Jason Jacobi bragged about how the vendors and affiliates would not recognize that they were not paid commissions on sales generated in accordance with the terms of affiliate agreements. Jason Jacobi was terminated after a violent verbal confrontation with Dave Owen.

52. Nicholas Bomersbach gloated about his disdain for his predecessor, Melanie Angermann, and how he perpetrated an internal political coup to take over her job position. She was also aware of the misreporting of revenues and failure to accurately pay suppliers and affiliates,
There is a massive turnover rate of staff at Jcpenney due to this type of personal agendas and political maneuvering which frequently results in vendor contract terminations after JCPenney commits theft of trade secrets.

53. Other know occurrences of Theft of Trade Secrets by JCPenney include:

    i.  Hijacking source code from LinkShare and altering to reverse engineering to build an "in-house" affiliate program.

    ii.  Granting contracts to outsourced vendors and recruiters long enough to capture the trade secrets, processes, techniques and skills of the contractors. Then stealing the processes for the benefit of JCPenney in violation of confidentiality agreements. JCPenney knew the contractors could not afford to litigate the theft of trade secrets.

    iii.  Hiring US WEB/MarchFirst to design and program the infrastructure for JCPenney.com, then refusing to pay for services rendered. Jcpenney claimed the "look and feel" was owned by them, although they committed theft of trade secrets by stealing the development techniques and creative processes of MarchFirst. JCPenney effectively conspired to destroy the company of MarchFirst by refusing to pay for its services, then litigating with the company until it was dissolved.

    iv.  Rewriting Microsoft software code in violation of confidentiality and licensing agreements.

    v.  JCPenney's IS department gloats about having unlicensed copies of software throughout the company. They express that vendors are not permitted to audit the software throughout the JCPenney Corporate headquarters which allows them to continue this criminal act.

54. JCPenney misleads consumers and the public about secure purchases on JCPenney.com. In truth, JCPenney has incompetent and negligent technical staff that refused and failed to upgrade Microsoft software, despite recommendations from several independent consultants and Microsoft. This lead to compromise of Jcpenney.com whereby hackers captured credit card and personal information of consumers. If JCPenney had not hacked software to steal the trade secrets of Microsoft to take development in-house and reduce costs, the software patches and upgrades would have prevented the majority of hackers from stealing JCPenney customer information.

55. <u>Theft of trade secrets</u>. US CODE TITLE 18 > PART I > CHAPTER 90 > Sec. 1832.

    Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy; Any organization that commits any offense described in subsection (a) shall be fined not more than $5,000,000.

Count 2 – RICO

56. <u>JCPenney and the defendants engaged in racketeering and organized crime</u> to perpetrate fraud against the plaintiff, investors, the government, media, suppliers and vendors.

57. Defendant JCPenney, directly or indirectly, by use of the means or instruments of interstate

commerce, or of the mails, or of emails, or of wire transmissions, or of a facility of a national securities exchange, knowingly or recklessly (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities and upon other persons, in connection with the purchase or sale of a security.

58. Defendant JCPenney, and members of its senior management, knew, should have known, or were reckless in not knowing, that its 2001 Form 10-K, and its Form 10-Q for the first quarter of 2002, including the financial statements contained therein, as filed with the Commission, contained material misstatements and omissions.

59. By reason of the foregoing, JCPenney violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

60. Civil remedies for RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO). TITLE 18 TITLE 18 > PART I > CHAPTER 96 > Sec. 1964.

Count 3 – Fraud

61. JCPenney to commit or plan to commit what the it knew or reasonably should have known to be a crime or fraud; The defendant attorneys hired by JCPenney perpetrated the fraud and subsequent cover ups on behalf of the defendants.

JCPenney's Conspiracy to Defraud the Plaintiff, Government and Investors

62. JCPenney provides retail products to both U.S. and non-U.S. consumers. JCPenney is a public company whose securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and it is required to file periodic reports with the Commission pursuant to Section 13 of the Act. Throughout the relevant time period, JCPenney's stock was covered by Wall Street analysts who routinely issued quarterly and annual earnings estimates.

From at least the second quarter of 2002 through the second quarter of 2003, defendant J.C.Penney Company, Inc. ("JCPenney") defrauded the plaintiff and investors. In a scheme directed and approved by its senior management, including defendant Allen Questrom in collusion with Nicholas Bomersbach, JCPenney disguised its true operating performance by using undisclosed and improper accounting that materially overstated its income and profitability and falsely inflated JCPenney stock valuation and concealed risks to investors.

JCPenney's knowingly false statements of profits resulted in misreporting of sales revenues which was brought directly to the attention of CEO Allen Questrom, VP Vanessa Castagna, Investor Relations Director Eli Akresh, Marketing Director Nicholas Bomersbach, VP Ken Hicks, and other Executives by the plaintiff. Rather than investigate and correct the known defects in technology and violations of GAAP (Generally Acceptable Accounting Practices), these Officers of JCPenney perpetrated a fraud against the plaintiff, investors and the public.

When the plaintiff exposed the Corporate Fraud and Corruption by JCPenney and the defendants, a retaliation conspiracy was connived by the defendants to destroy, harm and

irreparably injure the plaintiff and his livelihood. Therefore, a civil lawsuit to restrain JCPenney became necessary to protect and save the plaintiff's life from imminent danger.

63. After the plaintiff notified JCPenney Executives with written notice of its misreporting of revenues and providing the defendants a fair and reasonable opportunity to correct the financial misstatements, the defendants retaliated against the plaintiff in order to perpetrate fraud on Wall Street Investors as cover up to conceal JCPenney's criminal actions.
 The defendants put a hit on the plaintiff by hiring henchmen to harm, injure, victimize and commit character assassination. JCPenney intended with malice to utterly destroy the life, future and career of the plaintiff in retaliation for his informant role to the government of crimes committed by the JCPenney defendants.

Liability of defendant JCPenney's Legal Department and unethical attorneys for Conspiracy to Commit, Financial Misrepresentation and to Perpetrate Crimes, Including Violations of the Sarbanes-Oxley Act

64. Upon information and belief, JCPenney's Legal Department and Senior Management hired, directed and approved unethical attorneys Alan Langer, Celeste Flippen and Jerome Lipsich to commit subornation of perjury, a conspiracy of fraud, possible bribery of elected officials in its headquarters of Collin County, Texas. The scheme was to hire presumably loyal "in-house" counsel to represent JCPenney as henchmen while knowing that an outsourced law firm would be ethically and legally required to report criminal activity by JCPenney.
 The JCPenney Legal Department's plots and schemes to cover up criminal acts have made the defendant attorneys personally liable.
 Criminal acts were perpetrated whereby defendant Celeste Flippen, on behalf of JCPenney, attempted to bribe, extort and/or threaten the plaintiff to retract letters written to the Securities and Exchange Commission (SEC) which reported possible Shareholder Fraud and Insider Trading that these corrupt attorneys purportedly plotted internally at JCPenney to conceal from the investors, stock brokers, public and the media.

65. Defendant Celeste Flippen threatened and solicited bribery and/or extortion of a Federal witness in order for her to knowingly obstruct justice and perpetrate fraud.
 The illegal "offer" from defendant Celeste Flippen stated to the plaintiff, "Brett Barnes will retract the letter sent to OSHA, EEOC and the SEC."
 By tampering with a Federal witness in order to conceal criminal Corporate Fraud by JCPenney, Celeste Flippen violated civil and criminal Federal laws whereby she may be punished through monetary liability and/or imprisonment by this court.
 Celeste Flippen in collusion, and on behalf of the other defendants stated, "Brett Barnes will disclose to JCPenney any and all complaints or grievances that have been filed with any FEDERAL, state or local agencies or other third parties against JCPenney or any of its parent, subsidiaries, officers or employees, and WILL SEND LETTERS TO ALL SUCH AGENCIES WITHDRAWING ANY SUCH COMPLAINTS OR GRIEVANCES".
 These blatant threats and conspiracy to cover up Corporate Fraud and purported Insider Trading at JCPenney were intended as intimidation and threats to harm, scare, injure and victimize the plaintiff. The subversive plot by JCPenney to undermine the integrity of the Judicial System was to prevent a FEDERAL WITNESS from testifying to Government agencies against JCPenney corruption and crimes.

**Nicholas Bomersbach was a Primary Defendant Who Plotted a Conspiracy**
of Retaliation and Intimidation Against Witnesses To Cover Up Misrepresent and
Fabricate, Alter and Falsify Material Financial Information

66. <u>Nicholas Bomersbach introduced false evidence and committed aggravated perjury</u> with false statements, fabricated and altered material evidence and perjured testimony in civil lawsuits. He has been a primary conspirator in JCPenney's plots to harm, injure and destroy the plaintiff's livelihood <u>in retaliation for exposing Nicholas Bomersbach's alliance with the Arthur Anderson/Enron scandals.</u>

    JCPenney attorneys went to great lengths to hide the fact that a key JCPenney officer, <u>Defendant Nicholas Bomersbach, was involved with the Arthur Andersen and Enron scandal, and its destruction of documents.</u> Upon information and belief, JCPenney has engaged in acts to destroy and cover up documents which would evidence and expose its Corporate Fraud. To cover up the misreporting of finances in violation of GAAP, Nicholas Bomersbach fired Andy Kennemer who was the primary statistician who brought technical errors in sales reporting to Nicholas' direct attention.

    <u>Rather than react and resolve known overstatements and financial manipulation for JCPenney.com,</u> Nicholas Bomersbach ordered reputation killing hit men to destroy anyone who had knowledge to expose his criminal cover up.

    Bomersbach also fired 12 year veteran Paul Swenson who was about 2 years from retirement. After "Nick" Bomersbach knew that Paul Swenson had substantial evidence to expose JCPenney's Corporate Fraud, Paul became a casualty of the intimidation and retaliation wars perpetrated by JCPenney to conceal its crimes from investors and the public. The plaintiff discovered Nick's plots, including the overthrow of his victim predecessor, Melanie Angermann. Therefore, Nick plotted to threaten, extort, blackmail, harm and injure the plaintiff to prevent his knowledge that could expose Bomersbach's conspiratorial schemes.

Defendants Knowingly Falsified, Altered, Fabricated and Misrepresented Financial Statements
<u>for JCPenney to injure a witness and to evade paying for services rendered by the plaintiff</u>

67. By misreporting and knowingly inflating certain sales revenues for its struggling dot com, JCPenney falsely exaggerated its profits during at least second quarter 2002 through second quarter 2003. JCPenney's fraudulent reporting of its actual sales violated the established standards of generally accepted accounting principles ("GAAP"). JCPenney's intentional misstating of revenues and other risks was not disclosed to investors in a timely fashion, and misled investors about JCPenney's reported earnings.

68. The conspiracy to cover up knowingly inaccurate financial statements to Shareholders and the SEC was directed and approved by JCPenney's senior management all the way to JCPenney's CEO Allen Questrom. Mr. Questrom cannot truthfully deny that he was personally served and notified of the financial inaccuracies prior to his signing a false financial statement sworn under oath. JCPenney has failed to notify investors of the risks associated with civil lawsuits, ongoing SEC and other law enforcement investigations into JCPenney's corruption. The JCPenney defendants injured and harmed the plaintiff in retaliation of his exposing this Corporate Fraud to the SEC and other government agencies, when they knowingly plotted to cover up the matter.

69. JCPenney committed theft of service from the plaintiff and other vendors, suppliers or contractors in order to overstate its profits. Rather than pay for services rendered JCPenney placed order with no intent to fulfill the terms of contracts thereby injuring the victims by a large Corporation that premeditates anticipatory breach of contracts prior to signing. JCPenney requests financial statements in advance of contract signings with suppliers in order to determine the amount of attorney fees that contract signers can afford. Thereafter, JCPenney strategized to breach contracts, while falsely accusing suppliers of the breach, knowing that they cannot afford to litigate with a large Corporation. These bully tactics by JCPenney especially victimize small businesses and contractors whereby JCPenney plans in advance to steal products and services. Such tricks were used against the plaintiff for JCPenney to evade payment for services rendered by the plaintiff.

70. JCPenney's intentional high volume of technical errors, failure to upgrade software, patches or secure its JCPenney.com Ecommerce website (despite Microsoft's urgency) resulted in associated legal risks to customers. Potential hackers breaching the negligent and incompetent security measures was not disclosed to investors in a timely fashion, and misled investors about JCPenney's potential risks and liabilities of JCPenney.com customer's possible stolen credit card and personal information from lax and inept security measures. The JCPenney defendants injured and harmed the plaintiff in retaliation of his exposing these risks to senior management, when they knowingly plotted to cover up the matter.

71. This improper accounting actions by JCPenney were intended to manipulate JCPenney's earnings in the year ending 2002 through at least the second quarter of 2003 to keep them in line with estimates by Wall Street analysts. The defendants hated the plaintiff for his knowledge which uncovered the JCPenney scandal and sought to essentially end his life and career.

72. JCPenney restructured its Catalog business and closed its Atlanta Catalog Fulfillment Center and two telemarketing centers in Atlanta and Lenexa, Kan. Since 2000, Catalog has closed two fulfillment centers, four telemarketing centers, and 17 outlet stores. This is another example of its financial duress which resulted in cancellation of supplier and non-payment for services, including those provided individually by the plaintiff.

73. JCPenney is the defendant in a Multi-Billion dollar lawsuit for telemarketing fraud filed by Houston attorney David Berg against its former JCPenney Direct Marketing Services which was sold to Aegon. Upon information and belief, the defendants determined that the plaintiff is a possible witness against the fraud of JCPenney in that case. If JCPenney did not have the corruption, Corporate Fraud and conspiracy similar to the scandals of Enron, WorldCom, Tyco and Martha Stewart, etc.., they would have welcomed the plaintiff's feedback. Instead, JCPenney has sought to harm and utterly destroy the plaintiff to prevent his possible testimony. The defendants online experiments went awry with JCPenney Direct Marketing when they charged, but refused to refund paying customers for its quickly failed JCPenneyPetClub.com and possible insurance fraud regarding LeisurePlus and PlanPlus websites.

74. JCPenney, the defendant, is a vexatious litigant that files lawsuits and has drafted threat letters to thousands of vendors and innocent companies. When the defendants fear tactics fail, they resort to frivolous, groundless and vexatious lawsuits pre-meditated to destroy businesses. They have devastated countless thousands of lives of faithful employees who were fired based on internal political agendas.

75. The defendants will certainly use the same tactics as in their previous litigious cases with the belief that the best defense is a good offense. This is a typical ploy by Large Corrupt Corporations that intend to cover up unlawful and criminal acts. The defendants will evade the Federal Question requirements of the Well-pleaded Complaint Rule, and launch personal vendetta attacks on the plaintiff.

76. However, the claims before the court are not about the mere disgruntled JCPenney defendants who hate the plaintiff. The facts of this lawsuit relate to the defendants intentional unlawful and criminal acts for which they must be held accountable in accordance with fair play and impartiality determined by laws of the United States of America.

77. Defendants attorneys conspired with judges in ex-parte communications to violate the plaintiff's Due Process Rights of the 14th Amendment of the United States Constitution.

78. Undoubtedly, the defendants will reference other lawsuits which have no relevance the Federal question and this lawsuit. JCPenney's history exposes that it will improperly use the Federal court for a vendetta and personal attack to file harassing and frivolous pleadings. The plaintiff will immediately seek sanctions against the defendants when JCPenney's abuse of the legal system continues in this court.

79. Defendants Alan Langer, Celeste Flippen and Jerome Lipsich engaged in fraud perpetrated on behalf of JCPenney intended to Cover Up Corporate Fraud, Financial Misreporting as sales revenues and other crimes by JCPenney.

80. Internal accounting, auditing and sales tracking software at Jcpenney is known by the defendants to be defective. The high turnover rate of contractors and low-level experience of under-paid employees who tolerate the abuse by Jcpenney have resulted in neglect to repair the systems. To make matters worse, Jcpenney's financial crisis, cutbacks and five year turnaround mandate imposed on CEO Allen Questrom resulted in antiquated "legacy" computer systems, outdated software, failure to upgrade and secure commerce technology. The defendants habit of purchasing the cheapest software through cut throat negotiation tactics brought about the defendant's current state of known financial inaccuracies with knowingly fraudulent, false, deceptive and/or misleading reporting of sales revenues by JCPenney Executives and Directors.

81. The plaintiff reported Jcpenney's Accounting Irregularities, misreporting of finances by Nicholas Bomersbach and others to the Executive Officers at JCPenney, including CEO Allen Questrom. Rather than investigate the possibility of Accounting Fraud, Allen Questrom, Nicholas Bomersbach and others conspired to perpetrate a fraud with a Corporate wide cover up to prevent the JCPenney Shareholders and public from obtaining information of Jcpenney's financial misreporting.

82. Within days after the defendants received a letter that the plaintiff had reported JCPenney's illegal acts to the Securities and Exchange Commission, EEOC, OSHA and other Federal agencies, Allen Questrom, Nicholas Bomersbach and others directed a retaliation personal attack against the plaintiff with the further intent to cover up crimes perpetrated by JCPenney's hierarchy.



83. Allen Questrom deceived investors for several years into the belief that JCPenney would become more profitable, once it sold Eckerd, as an inducement to overvalue and falsely inflate stock prices. This occurred while Questrom and his co-conspirators internally discussed that Eckerd was a disaster which they could possibly never dump. This and other Insider Trading information sparked JCPenney employees to buy and sell stock, independently and through friends, based on internally discussed knowledge. The truth is that JCPenney knowingly failed and refused to provide any support to Eckerd by means of technology, experience, shared resources, etc…

84. When Eckerd was positioning to launch an E-commerce website to remain competitive in the industry, JCPenney washed its hands of any support, knowing that it would financially harm the JCPenney shareholders by devaluing the stock prices. This was a scam ploy by JCPenney Executives for the future plot to sell Eckerd. By knowingly disseminating misinformation to the JCPenney shareholders, wall street analysts, the public and media, JCPenney fraudulently induced investors into believing a "sure bet" that its stock would rise once they sold Eckerd, it's thorn in the side. Knowing that the shareholders and public would believe that Eckerd was pulling down the JCPenney stock value, Executives at JCPenney made pre-meditated maneuvers to ensure its sister company would fail. At that point, and with pre-meditated market timing,

85. JCPenney's "INSIDERS" have foreknowledge of buy and sell dates for stocks. When Eckerd sells, JCPenney will take a large financial loss to reduce the stock prices. The JCPenney Executives have foreknowledge of these dates. Once the stock prices recover in subsequent years, the Executives will profit, while resigning from JCPenney. These schemes have been bantered about internally at JCPenney for years to profit from Insider Trading. Unfortunately, the SEC and government agencies have failed to act in a timely manner and JCPenney Executives fire or threaten and intimidate anyone with knowledge of these facts. Additionally, JCPenney employees are coached by attorneys to destroy documents, or only discuss plots behind closed doors to AVOID THE PAPER TRAIL. With the backing of a $17 billion dollar Corporation, JCPenney employees, accountants and attorneys are arrogant and perceive themselves to be immune to any liability or criminal charges. JCPenney attorneys coach witnesses not to say anything at trials, and pass signals to witnesses during testimonies. Executives at JCPenney have no aversion to committing perjury since they know that experienced attorneys manipulate the court systems for them to get away with virtually any criminal acts. These are additional types of tactics by JCPenney which have harmed and injured the plaintiff and defrauded him of monies.

86. The defendants at JCPenney retaliated against the plaintiff in clear violation of
    US Code - Sec. 1107. RETALIATION AGAINST INFORMANTS.
        (a) Section 1513 of title 18, United States Code:
            "(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

87. A civil conspiracy plot was cunningly crafted by JCPenney's in-house attorneys Alan Langer, Celeste Flippen and Jerome Lipsich. In-house counsel was used in lower court litigation since JCPenney was afraid that outsourcing attorneys would expose the criminal acts and fraudulent concealment within the company.

88. Defendant Allen Questrom, CEO of JCPenney, made knowingly false Sworn material statements to the Securities and Exchange Commissioner (SEC) and other Federal agencies.

89. The defendants attorneys have a track record whereby they "muddy the waters" by launching defamatory personal attacks on opponents. This is quite simply the pattern to conceal JCPenney's Corporate Fraud from the public. This has been a scheme perpetrated by the defendants to conceal their criminal acts. As one attorney recently stated, "JCPenney sues at the drop of a hat". There plots to cover up illegal acts follow:

    a)    JCPenney sends threat letters to vendors or persons after they steal trade secrets and/or services.

    b)    JCPenney terminates employees or vendor contracts while accusing them of substandard performance, no matter how effective the work performed. Firing of employees if almost always an internal political coup at Jcpenney Corporate headquarters.

90. The defendants at JCPenney have a contempt of court habit of hiding, threatening, paying off and/or "controlling" subpoenaed key witnesses, especially Donna Hezeau and Paul Swenson, who have relevant testimony to expose JCPenney's crimes.

91. The defendants made misrepresentations to the plaintiff, Wall Street investors and the public;

    a.    The representations were material and false.

    b.    Defendants intentionally withheld material facts to avoid payment of commissions and debts,

    c.    Defendant falsely stated that certain sales figures were not generated by its suppliers performance in order to evade payment for services rendered.

    d.    When the defendant made the representation, it knew the representation was false, or made the representation recklessly, as a positive assertion, and without knowledge of it truth;

    e.    The defendants made the representations with the intent that the plaintiff act on it;

    f.    The plaintiff relied on the representation; and

    g.    The representation caused the plaintiff injury.

<u>Count 4 – Breach of contract</u>

92. Plaintiff fully performed contractual obligations upon request by the defendant.

93. Defendants refused to pay for services despite unjust enrichment whereby JCPenney profited substantially from the plaintiff's work, although JCPenney refused to pay for all services rendered.

94. Plaintiff fulfilled the terms of the contract with full performance of the on demand services. JCPenney continues to profit with unjust enrichment to date as a result of the plaintiff's work for which the defendants agreed to pay in the future.

<u>Count 5 – Defamation</u>

95. The defendant injured, damaged and harmed the reputation of the plaintiff,

96. Defendant launched smear campaigns against the plaintiff planned to destroy his finances and career.

97. Defendant engaged in falsely disparaging the performance of the plaintiff's work.

98. Defendant made threats to plaintiff of causing future loss of income by ongoing defamation.

99. The defendant published a statement of fact;

100.    The statement referred to the plaintiff;

101.    The statement was defamatory,

102.    The statements was false,

103.    With regard to the truth of the statement, the defendant was

104.    negligent; and/or

105.    liable without regard to fault;

106.    The plaintiff suffered injury.

107.    Defendant also performed defamation by innuendo and/or implication.

<u>Count 6 – Libel per se</u>

108.    Defendant directed certain companies not to work with the plaintiff.

109.    Defendants published statements intended to injure the plaintiff's current and future income. Plaintiff sues for current and future loss of income.

110.    Statements by the defendant injured the reputation of the plaintiff.

111.    The statement injured the profession or occupation of the plaintiff.

112.    Statements were so obviously hurtful to the plaintiff that it requires no proof of its injurious character to make it actionable.

113.    Plaintiff suffered injury which may include, but not limited to,

114.    injury to reputation,

115.    personal humiliation,

116.    mental anguish and suffering.

### Count 7 – Conversion

117.    The defendants perpetrated crimes and/or torts of interfering with the ownership of another's movable or personal property without authorization or justification (as a lien) and esp. of depriving the owner of use and possession.

118.    The defendants knowingly and intentionally deprived the plaintiff of property, without justification.

119.    <u>Fraudulent Conversion</u> – "Conversion committed with the intent of defrauding someone".

120.    <u>Defendant Nicholas Bomersbach committed perjury</u>, collusion and conspiracy with the other defendants in order to defraud the plaintiff of property.

### Count 8 – Negligent Misrepresentation

121.    The defendant made representations to the plaintiff in transaction in which the defendants had a personal monetary interest.

122.    The defendant supplied false information for the guidance of others;

123.    The defendant did not exercise reasonable care or competence in obtaining or communication the information;

124.    The plaintiff justifiably relied on the representation; and

125.    The defendant's negligent misrepresentation proximately caused the plaintiff's injury.

### Count 9 – Negligence

126.    The defendant owed a legal duty to the plaintiff;

127.    The defendant breached the duty; and

128.    The breach proximately caused the plaintiff's injury.

129.        JCPenney failed to supervise and the financial misstatements of the defendants.

### Count 10 - Invasion of Privacy

130.        The defendants intruded on the seclusion of the plaintiff by "intelligence gathering", opening private mail, spying on secret processes and techniques, Corporate espionage,

131.        Following, spying on and harassing the plaintiff. For example, defendant Jerome Lipsich followed the plaintiff into a Walgreen's store for the purposes of harassment.

132.        JCPenney employees made repeated harassing phone calls to the plaintiff's home as early as 5:30 AM while using profanities and threats.

133.

### E. Conditions Precedent

134.        All conditions precedent have been performed or have occurred.

### F. Prayer for Relief

WHEREFORE, the Plaintiff respectfully requests that this Court Enter Orders:

135.        Prohibiting JCPenney and its affiliates, officers, directors, employees, and agents, from destroying, altering, or removing from the court's jurisdiction any documents relevant to the matters alleged herein.

136.        Prohibiting JCPenney and its affiliates from making any extraordinary payments to any present or former affiliate, or officer, director, or employee of JCPenney, or its affiliates, including but not limited to any severance payments, bonus payments, or indemnification payments.

137.        Plaintiff requests a temporary injunction enjoining JCPenney and its employees and subsidiaries from harassing, tampering, or otherwise interfering with the plaintiff's employment opportunities, or prospective clients.

138.        Plaintiff requests a temporary injunction enjoining JCPenney and its employees and subsidiaries from harassing, tampering, or otherwise interfering with the plaintiff's testimony and reporting of evidence to any governmental agency.

139.        Plaintiff requests a temporary injunction enjoining JCPenney and its employees and subsidiaries from slanderous or libelous statements or business disparagement in any form.

140.        Plaintiff requests a temporary injunction enjoining JCPenney and its employees and subsidiaries from any form of retaliation against the plaintiff as a result of his testimony to expose Jcpenney's Corporate Fraud and corruption.

141.        Permanently restraining and enjoining JCPenney from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

142.    Permanently restraining and enjoining JCPenney from violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

143.    Imposing civil monetary penalties on JCPenney pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u];

144.    Appointing a corporate monitor to ensure compliance with the above;

145.    Granting such other and additional relief as this Court may deem just and proper.

For these reasons, plaintiff asks for judgment against defendant for the following;

146.    An award for damages to be paid by the defendant to the plaintiff in the amount of $2,000,000,000 (TWO BILLION DOLLARS).

147.    Plaintiff asks the court to order the attorney general and appropriate government agencies to investigate JCPenney's crimes in accordance with US Code, and protect the plaintiff as a witness, in accordance with the following Federal laws:

a.  Action to compel an officer of the United States to perform his duty.
    TITLE 28 > PART IV > CHAPTER 85 > Sec. 1361.
        The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

b.  Obstruction of proceedings before departments, agencies, and committees. TITLE 18 > PART I > CHAPTER 73 > Sec. 1505.

c.  Conspiracy to commit offense or to defraud United States. TITLE 18 > PART I > CHAPTER 19 > Sec. 371.

d.  Possession of false papers to defraud United States. TITLE 18 > PART I > CHAPTER 47 > Sec. 1002

e.  Civil proceedings to enjoin violations. TITLE 18 > PART I > CHAPTER 90 > Sec. 1836.

f.  Orders to preserve confidentiality. TITLE 18 > PART I > CHAPTER 90 > Sec. 1835.

g.  Interference with commerce by threats or violence TITLE 18 > PART I > CHAPTER 95 > Sec. 1951.

h.  Retaliating against a witness, victim, or an informant TITLE 18 > PART I > CHAPTER 73 > Sec. 1513.

i.  Commerce and antitrust regulations TITLE 28 > PART IV > CHAPTER 85 > Sec. 1337.

j.  Civil Rights TITLE 28 > PART IV > CHAPTER 85 > Sec. 1343.

k.  Conspiracy to interfere with civil rights TITLE 42 > CHAPTER 21 > SUBCHAPTER I > Sec. 1985

l.   <u>Federal Questions</u> TITLE 28 > PART IV > CHAPTER 85 > Sec. 1331.


<u>G. Damages</u>

148.      Plaintiff seeks unliquidated damages that are within the jurisdictional limits of the court.

149.      Defendant used unlawful acts of fraud, negligent misrepresentation and other causes of action to essentially steal money and/or services from the plaintiff, or in the alternative JCPenney, the defendant, refused to pay its debts.

150.      Defendant wrongfully injured, harmed and defamed the reputation and career of the plaintiff.

151.      Defendant  caused an ongoing loss of past, current and future income to the plaintiff.

152.      As a direct and proximate result of defendant's conduct, plaintiff suffered the following injuries and damages and sues defendant for at least $2,000,000,000 (Two Billion Dollars):

    a)      Actual damages,

    b)      Punitive Exemplary damages,

    c)      Future damages,

    d)      Property damage,

    e)      Mental anguish in the past and future,

    f)      Lost earnings,

    g)      Loss of profits

    h)      loss of goodwill,

    i)      loss of credit,

    j)      Loss of income and benefits,

    k)      Damage to career and reputation,

    l)      Humiliation and embarrassment,

    m)      Damage to earning capacity,

    i.   Special damages of:

        a.   loss of current earning capacity

        b.   economic injury;

        c.   personal injury

        d.   business destruction;

        e.   loss of current earning capacity

        f.   damage to business's credit reputation;

        g.   lost pecuniary benefits.

        h.   lost insurance benefits.

    n)      Prejudgment and postjudgment interest,

    o)      Costs of suit, including attorney fees,

    p)      All other relief, in law and in equity, to which plaintiff may be entitled.

    q)      All other relief the court deems appropriate.

### H. Attorney Fees

153.  Plaintiff is entitled to an award of attorney fees and costs.

### I. Demand for Jury

154.      Plaintiff demands a jury trial.

### J. Conclusion

155.  For these reasons, plaintiff asks that defendant be cited to appear and answer and, on final trial, that plaintiff have judgment against defendant.

156.  Plaintiff reserves the right to replead orally or amend this petition.


Respectfully submitted,

Brett Barnes
18352 Dallas Parkway, Suite 136

Dallas, TX. 75287
Tel. 972-839-8188